# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| CINDY LYNN COBURN, | ) | CASE NO. 1:18CV668 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Cindy Lynn Coburn, ("Plaintiff" or "Coburn"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying her application for Period of Disability ("POD") and Disability Insurance Benefits

("DIB"), under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a

Report and Recommendation.  For the reasons set forth below, the Magistrate Judge

recommends that the Commissioner's final decision be VACATED and the case REMANDED

for further consideration. [2]

_____

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

[2] On December 26, 2018, this matter was stayed due to the lapse of congressional
appropriations funding the federal government.  *See* General Order 2018-15.  The stay
was thereafter extended pursuant to General Order 2019-1.  As the government shutdown

## I.   PROCEDURAL HISTORY

In January 2015, Coburn filed an application for POD and DIB, alleging a disability onset date of December 22, 2009 and claiming she was disabled due to rheumatoid arthritis, diabetes, neuropathy, lupus, and fibromyalgia.  (Transcript ("Tr.") 15, 250.)  The application was denied initially and upon reconsideration, and Coburn requested a hearing before an administrative law judge ("ALJ").  (Tr. 15, 125-127, 129-136.)

On December 21, 2016, an ALJ held a hearing, during which Coburn, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 34-93.)  On April 27, 2017, the ALJ issued a written decision finding Coburn was not disabled.  (Tr. 15-33.)  The ALJ's decision became final on February 2, 2018, when the Appeals Council declined further review.  (Tr. 1-6.)

On March 23, 2018, Coburn filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 16, 19, 20.)  Coburn asserts the following assignments of error:

(1)     The ALJ improperly considered the medical opinion offered by the Commissioner's psychological consultant Bonnie Katz, Ph.D.

(2)     The ALJ's determination that Plaintiff did not meet Listing 14.06A is not supported by substantial evidence.

(Doc. No. 16.)

## II.   EVIDENCE

### A.     Personal and Vocational Evidence

Coburn was born in June 1968 and was 48  years-old at the time of her administrative hearing, making her a "younger" person under social security regulations.  (Tr. 25.)  *See* 20

has ended, the stay imposed by General Orders 2018-15 and 2019-1 is hereby lifted.

C.F.R. §§ 404.1563 & 416.963.  She has at least a high school education and is able to

communicate in English.  (*Id.*)  She has past relevant work as a child daycare worker and teacher

aide.  (*Id.*)

**B.**     **Relevant Medical Evidence[3]**

At the outset, the Court notes the recitation of the facts in the Commissioner's Brief on

the Merits is perfunctory and fails to comply with this Court's Initial Order.  In relevant part, that

Order (Doc. No. 8) states: "Defendant's brief shall specifically **address the legal issues and**

**facts** **cited by plaintiff** and shall cite, by exact and specific transcript page number, **all relevant**

**facts** in a 'Facts' section." (*Id.* at 3.) (emphasis added).  Here, the Commissioner's entire

discussion of the lengthy medical record[4] in this case is one and a half pages long, consisting of

no more than four short paragraphs.  (Doc. No. 19 at 2-3.)  The Facts section of the

Commissioner's Brief does not address the thorough recitation of the facts set forth in Plaintiff's

Brief and, of particular concern, fails entirely to discuss *any* of the numerous treatment notes,

imaging reports, and other medical evidnce from the nearly five year period between Coburn's

December 2009 alleged onset date and October 2014.  (*Id.*)  The Commissioner does not provide

any explanation for failing to discuss the medical evidence for this extended time period.

As the Court limits its discussion of the medical evidence to the evidence cited in the Fact

Sections of the parties' Briefs, the Commissioner's failure to thoroughly address the medical

evidence in accordance with this Court's Order is concerning.  The Commissioner is in breach of

_____

[3] The Court's recitation of the medical evidence is not intended to be exhaustive and is
limited to the evidence cited in the parties' Briefs.

[4] The Transcript in the instant case is over 1300 pages. (Doc. No. 13.)

this Court's Order in the instant case and, moreover, has failed to abide by this Court's briefing requirements in other recent social security cases as well.[5]  The Commissioner is cautioned that there will be consequences for any further breaches of this Court's Orders.

### 1.      Physical Impairments

On January 19, 2010, Coburn presented to rheumatologist Terrance Foley, M.D., with complaints of foot, hip, knee, and shoulder pain. (Tr. 940.)  She reported experiencing foot pain for the past several years, and indicated it had become "really severe" during the previous six months.[6]  (*Id.*)  On examination, Dr. Foley noted reduced range of motion in Coburn's knees, ankles, right shoulder, and spine; and multiple tender points.  (Tr. 937.)  He also found normal pulses, normal gait, normal muscle strength, and no edema.  (*Id.*)  Dr. Foley assessed "atypical arthralgia," prescribed Relafen, and ordered blood work.  (*Id.*)

The following month, Coburn reported she was "no better."  (Tr. 936.)  She complained of morning stiffness, fatigue, muscle cramps in her lower extremities, and tenderness in her feet, heels, and fingers.  (*Id.*)  Dr. Foley noted Coburn had positive ANA and stated a diagnosis of inflammatory arthritis should be considered.  (Tr. 935-936.)  Examination revealed reduced range of motion in her hips, knees, ankles, and spine; tenderness in her bilateral feet; tender points; and

---

[5] The Commissioner's failure to follow this Court's briefing Order was recently noted in *Brownell v. Comm'r of Soc. Sec.*, Case No. 1:18cv950 (N.D. Ohio) (Doc. No. 16 at p. 3, fn. 2) and *Mason v. Comm'r of Soc. Sec,* Case No. 4:18cv865 (N.D. Ohio) (Doc. No. 16 at 2-3.)

[6] X-rays of Coburn's bilateral feet from December 2009 showed (1) mild osteoarthritic changes along the dorsal aspect of the tarsal bones; and (2) erosive and/or accompanying cystic changes involving the medial aspect of the metatarsal head of the right great toe. (Tr. 1045.)  X-rays of her cervical spine showed reversal of the normal lordotic curvature of the cervical spine, suggesting muscle spasm. (Tr. 1048.)

normal gait.  (Tr. 935.)  Dr. Foley assessed osteoarthritis, possible rheumatoid arthritis, positive

ANA, and Vitamin D deficiency.  (Tr. 936.)  He prescribed Tramadol.  (Tr. 935.)

 In March and April 2010, Coburn continued to report pain in multiple joints (i.e., her

wrists, ankles, hands, feet, hips, and knees), as well as muscle cramps, morning stiffness, and

fatigue.  (Tr. 933-934, 931-932.)  Examination findings included reduced range of motion, tender

points, knee crepitus, and normal gait.  (*Id.*)  Coburn reported she was able to do her activities of

daily living, but with pain.  (Tr. 932.)  Dr. Foley prescribed Tramadol and Flexeril.  (Tr. 931.)

 In September 2010, Coburn indicated she was "doing better" with only mild joint pain

and stiffness.  (Tr. 930.)  She rated her pain on that date a 3-4 on a scale of 10, and indicated she

was able to do her activities of daily living with pain.  (*Id.*)  On examination, Dr. Foley noted

reduced range of motion in Coburn's hips, knees, and spine; knee crepitus; mild tender points;

and normal gait.  (Tr. 929.)  He continued her on her medications.  (*Id.*)

 On March 18, 2011, Coburn reported increased pain and stiffness in her knees, hips, and

shoulders, as well as fatigue and morning stiffness.  (Tr. 927-928.)  Examination revealed

reduced range of motion in her hips, knees, and spine; tenderness in her fingers, shoulders, hips,

knees, and feet; mild tender points, normal muscle strength; and antalgic gait.  (Tr. 927.)  Dr.

Foley continued Coburn on her medications and ordered x-rays of her knees, which she

underwent that date.  (Tr. 927, 1043.)  The x-rays showed moderate to severe osteoarthritis in

Coburn's bilateral feet, including findings of subchondral sclerosis, extensive hypertrophic

osteophytosis, and narrowing of the patellofemoral compartments.  (*Id.*)

 On August 9, 2011, Coburn presented to primary care physician Julia Heng, M.D., with

complaints of swelling in her legs, feet, and hands.  (Tr. 725.)  Dr. Heng did not observe edema

on that date, but nonetheless prescribed medication.  (*Id.*)

Coburn returned to Dr. Foley on October 10, 2011.  (Tr. 923-924.)  She stated she was "better" but still experienced pain and burning in her feet.  (*Id.*)  Examination revealed decreased range of motion in her hips and knees, and normal gait.  (*Id.*)  Dr. Foley assessed positive ANA and degenerative disc disease, increased her Relafen dosage, and prescribed Gabapentin.  (*Id.*)  Coburn returned later that month, with continued complaints of numbness and dysthesias in her bilateral feet.  (Tr. 921-922.)  Dr. Foley assessed diabetes mellitus, peripheral neuropathy, osteoarthritis, and positive ANA.  (*Id.*)  He increased her Gabapentin dosage, and recommended Vitamin B12 injections.  (*Id.*)

On February 10, 2012, Coburn returned to Dr. Foley with complaints of foot pain, "burning [foot] dysesthesia in a stocking distribution," fatigue, and difficulty sleeping.  (Tr. 917-918.)  Examination revealed reduced range of motion in her hips, knees, and spine; tenderness in her feet; multiple tender points; reduced vibratory sensation; normal muscle strength; and negative straight leg raise.  (*Id.*)  Dr. Foley assessed (1) possible connective tissue disorder ("CTD") with arthralgia, stiffness, and fatigue; (2) probable fibromyalgia with poor sleep, fatigue, and tender points; and (3) probable depression.  (*Id.*)  He ordered an electromyography ("EMG")/nerve conduction study ("NCS"), and blood work; and prescribed Trazodone.  (*Id.*)

Coburn underwent the EMG/NCS on February 14, 2012, which was within normal limits.  (Tr. 1050.)  However, the interpreting physician noted that small fiber neuropathy could not be ruled out.  (*Id.*)

On July 9, 2012, Coburn complained of fatigue, insomnia, and pain in her feet, ankles, hips, and back.  (Tr. 913-914.)  She rated her pain an 8 on a scale of 10.  (*Id.*)  On examination,

6

Dr. Foley noted reduced range of motion in Coburn's hips and knees, multiple tender points, and normal gait.  (*Id*.)  He also found Coburn had a "melancholy" affect.  (*Id*.)  Dr. Foley assessed osteoarthritis, fibromyalgia, and positive ANA rule out CTD.  (*Id*.)  He increased her Trazodone and Gabapentin dosages.  (*Id*.)

The following month, Coburn continued to complain of pain, particularly in her feet.  (Tr. 909-910.)  She also reported fatigue, insomnia, numbness, and dysesthesias.  (*Id*.)  Examination revealed reduced range of motion, multiple tender points, and a slightly antalgic gait.  (*Id*.)  Dr. Foley prescribed Cymbalta. (*Id*.)

On February 13, 2013, Coburn stated she was "doing better" and reported improvement with Cymbalta and Trazodone.  (Tr. 907-908.)  On examination, Dr. Foley noted reduced range of motion in her hips, knees, and spine; and normal gait.  (*Id*.)  He assessed undifferentiated connective tissue disorder with positive ANA, fibromyalgia, osteoarthritis, peripheral neuropathy, and insomnia.  (*Id*.)

Coburn returned to Dr. Foley on June 19, 2013 with complaints of chronic neck, shoulder, and spine pain, which she rated a 5 on a scale of 10.  (Tr. 420-425.)  She also complained of chronic fatigue and insomnia.  (*Id*.)  Examination revealed reduced range of motion in Coburn's hips, knees, and spine; right shoulder tenderness; multiple tender points; and normal gait.  (Tr. 423.)  Dr. Foley assessed undifferentiated connective tissue disease with positive ANA, rashes, and arthralgias.  (Tr. 424.)  He also diagnosed osteoarthritis, peripheral neuropathy, and fibromyalgia, each of which had mild or minimal symptoms on current treatment.  (*Id*.)  Dr. Foley noted, however, that Coburn's insomnia was "not completely helped with current meds," and increased her Trazodone dosage.  (*Id*.)

7

On December 16, 2013, Coburn returned to Dr. Foley and reported "feeling low."  (Tr. 414-419.)  She complained of poor concentration and memory, dizziness, fatigue, "frequent crying," insomnia, morning stiffness, weakness, and peripheral neuropathy with dysesthesias in her feet.  (Tr. 414-415.)  Coburn stated "she is able to do all activities of daily living but is having difficulty coping with her feelings of depression and fatigue."  (Tr. 414.)  On examination, Dr. Foley noted normal muscle strength, normal pulses, normal gait, multiple tender points, and reduced range of motion in her shoulders, hips, knees, and spine.  (Tr. 417-418.)  Dr. Foley advised Coburn to resume taking Cymbalta, ordered blood work, and "strongly encouraged her to seek counseling and further treatment with psychiatry."  (Tr. 418.)

On March 27, 2014, Coburn presented to physician assistant Joana Zula, P.A., from Dr. Foley's office with complaints of chronic pain.  (Tr. 408-413.)  Ms. Zula recorded Coburn's many symptoms, as follows:

> The patient has undifferentiated connective tissue disease with positive ANA, rashes, and arthralgias. She is on treatment with Plaquenil. She has chronic neck, shoulder and spine pain. She resumed Cymbalta since the last office visit to help mitigate both the symptoms of pain and depression. She is still dealing with the recent loss of her parents in the fall of 2013. * * * The patient has experienced difficulty concentrating, feeling dizzy, and fatigue ever since this tragedy.  She still feels depressed with frequent crying. She denies suicidal ideation. The joint pain is also getting worse, especially the right shoulder in the past 5 months. She has failed multiple NSAIDs, and they have caused gastritis in the past and are intolerable. She doesn't exercise but tried home therapy for the shoulder. She sleeps fair but is still fatigued constantly. She has difficulty falling asleep. She takes trazodone to help her sleep but is inconsistent with this. She is gaining weight. Her last thyroid level was on the high end of normal. She has a history of spontaneous rash. * * * She also has peripheral neuropathy with dysesthesias in the feet. This has been helped with gabapentin but the symptoms are still bothersome. She  is able to do all activities of daily living but is having difficulty coping with her feelings of depression and fatigue.

(Tr. 408.)  On examination, Ms. Zula noted reduced range of motion in Coburn's right shoulder,

bilateral hips and knees, and spine; right shoulder tenderness; multiple tender points; and normal gait, pulses, and reflexes.  (Tr. 411-412.)  She assessed (1) undifferentiated connective tissue disease with positive ANA; (2) osteoarthritis in multiple sites; (3) peripheral neuropathy, with moderate symptoms on medication; (4) fibromyalgia; (5) depression; (6) chronic debilitating fatigue; and (7) Vitamin B12 deficiency despite injections.  (Tr. 412.)  Ms. Zula ordered a Vectra DA to monitor Coburn's inflammatory arthritis activity, and an MRI of her right shoulder.  (*Id.*)  She also prescribed Synthroid, and strongly encouraged Coburn to seek counseling and treatment with psychiatry.  (*Id.*)

Coburn underwent an MRI of her right shoulder on April 3, 2014, which showed moderate supraspinatus tendinosis with high-grade partial bursal sided tear of the mid supraspinatus tendon measuring 5 mm in dimension.  (Tr. 435.)  She also underwent Vectra DA testing, which revealed a score of 42 indicating moderate disease activity despite Plaquenil therapy.  (Tr. 402.)

On April 15, 2014, Coburn returned to Ms. Zula with continued complaints of chronic pain, weakness, fatigue, dizziness, neuropathy, and depression.  (Tr. 402-406.)  Examination findings and diagnoses were the same as her previous visit.  (Tr. 405-406.)  Ms. Zula prescribed Arava for treatment of her connective tissue disease, and referred Coburn to orthopedic surgery for evaluation of her right shoulder right rotator cuff tear.  (Tr. 406.)

The following month, Coburn presented to Dr. Foley and reported worsening joint pain, particularly in her right shoulder and left ankle.  (Tr. 396-401.)  She also continued to complain of fatigue, depression, difficulty concentrating, weakness, and neuropathy in her feet.  (Tr. 396-398.)  Examination revealed widespread reduced range of motion, tenderness in her right

shoulder and left ankle, tender points, and antalgic gait.  (Tr. 400.)  Dr. Foley assessed (1) undifferentiated connective tissue disease with positive ANA; (2) osteoarthritis in multiple sites; (3) peripheral neuropathy, with moderate symptoms on medication; (4) fibromyalgia; (5) depression; (6) chronic debilitating fatigue; and (7) Vitamin B12 deficiency despite injections. (Tr. 400.)  He continued Coburn on her medications.  (Tr. 401.)

In July 2014, Coburn reported continued joint pain and fatigue.  (Tr. 390.)  She stated her "neuropathy is worse since she is on Arava," and rated her pain a 6 on a scale of 10.  (*Id*.) Examination revealed widespread reduced range of motion, tenderness in her right shoulder and left ankle, tender points, and antalgic gait.  (Tr. 394.)  Ms. Zula prescribed Methotrexate and increased her Gabapentin dosage.  (Tr. 394-395.)

On August 8, 2014, Coburn returned to Dr. Heng.  (Tr. 449-450.)  She indicated she could no longer give herself B12 injections and requested that Dr. Heng provide them going forward.  (*Id*.)  Dr. Heng agreed, and gave Coburn an injection on that date.  (*Id*.)  The record reflects Coburn returned to Dr. Heng for B12 injections regularly in August, September, October, November, and December 2014.  (Tr. 711, 709, 448, 705, 447, 696, 444-446.)

On August 25, 2014, Coburn presented to Ms. Zula.  (Tr. 383-389.)  She reported continued joint pain, fatigue, weakness, insomnia, depression, and neuropathy.  (*Id*.) Examination revealed reduced range of motion in her bilateral wrists, right shoulder, bilateral hips and knees, and spine; tenderness in her bilateral wrists, right shoulder, and left ankle; tender points; and antalgic gait.  (Tr. 387.)  Ms. Zula ordered an EMG/NCG of Coburn's upper extremities, prescribed Amrix for low back pain, and recommended switching to Methotrexate injections.  (Tr. 387-388.)

Several months later, on November 17, 2014, Coburn returned to Dr. Foley with complaints of significant shoulder, elbow, back and knee pain, along with morning stiffness, constant fatigue, frequent crying spells, and insomnia. (Tr. 377-379.) Dr. Foley ordered a repeat Vectra DA to monitor inflammatory arthritis disease activity, and continued her on her medications. (Tr. 381-382.) Coburn underwent the Vectra DA testing later that month, which revealed a score of 39 indicating moderate disease activity. (Tr. 426.)

On February 23, 2015, Coburn continued to struggle with the same symptoms. (Tr. 370.) She rated her widespread joint pain a 5 on a scale of 10, and stated she was only able to walk moderate distances. (*Id.*) Examination revealed no edema; normal strength and pulses; reduced range of motion in her bilateral wrists, right shoulder, bilateral hips, bilateral knees, left ankle and spine; tenderness in her right shoulder, hips, and knees; tender points; and normal gait. (Tr. 373-374.) Dr. Foley assessed undifferentiated connective tissue disease with positive ANA; osteoarthritis; peripheral neuropathy and neuritis with mild to moderate symptoms on medication; fibromyalgia; depression; chronic debilitating fatigue; vitamin B12 deficiency;[7] and insomnia. (Tr. 374-375.) He continued Coburn on her medications and ordered additional Vectra DA testing to monitor her rheumatoid arthritis activity. (Tr. 375.)

The following month, Coburn reported increased lower back pain, rating it a 7 on a scale of 10. (Tr. 363-364.) She also complained of fatigue, morning stiffness for one hour each morning, dizziness, weakness, poor concentration and memory, dysesthesias, insomnia, depression, and intermittent rashes. (Tr. 364-365.) Examination findings were the same as her

---

[7] The record reflects Coburn continued to regularly present to Dr. Heng for Vitamin B12 injections throughout 2015. (Tr. 695, 693, 691, 689, 687, 685, 683, 681, 676, 674, 672 1113-1132.)

previous visit. (Tr. 367.)   Ms. Zula ordered an x-ray of Coburn's lumbar spine, and prescribed Lorzone and Vimovo.  (Tr. 367-368.)  Coburn underwent the x-ray that same day, which showed mild degenerative disc disease and lumbar spondylosis.  (Tr. 434.)

Later that month, Coburn underwent x-rays of her bilateral feet and ankles. (Tr. 432-433.)  The foot x-ray showed (1) mild degenerative changes in the tarsal region and left foot; and (2) mild erosive and degenerative changes in the right foot.  (Tr. 432.)  The ankle x-rays were normal, aside from small plantar calcaneal spurs.  (Tr. 433.)

Coburn subsequently underwent an MRI of her left ankle on April 6, 2015.  (Tr. 430.)  It showed the following: (1) severe osteoarthritis of the second, third, and fourth tarsometatarsal joints; (2) longitudinal peroneal brevis split tear as the tendon traverses the distal fibula measuring approximately 3cm; (3) mild synovitis in the common peroneal tendon sheath; and (4) mild chronic proximal plantar fasciitis.  (*Id.*)

On April 28, 2015, Coburn presented to podiatrist Jonathan Sharpe, D.P.M., for evaluation of her bilateral foot pain.  (Tr. 649-650.)  Examination revealed antalgic gait, bilateral edema, neurologic loss of protective sensation, +4/5 motor strength, normal muscle tone, and pain on palpation to the right plantar heel.  (*Id*.)  Dr. Sharpe assessed rheumatoid arthritis, degenerative joint disease of the foot/ankle, nontraumatic tendon rupture, Achilles tendinosis, and plantar fasciitis.  (Tr. 650.)  He prescribed ankle braces and referred Coburn to physical therapy.  (*Id.*)

Coburn returned to Ms. Zula on June 10, 2015, with reports of continued pain and fatigue.  (Tr. 831-837.)  Examination revealed reduced range of motion and tenderness in Coburn's fingers, wrists, right shoulder, hips, knees, and ankles; reduced spinal range of motion;

12

tender points; and antalgic gait.  (Tr. 835.)  Ms. Zula noted Coburn's continued symptoms despite medication and found she "may require biologic therapy for better rheumatoid arthritis disease control."  (*Id*.)  She also found Coburn's ambulation was "severely limited" and that her fibromyalgia symptoms were "debilitating" despite medication.  (Tr. 835-836.)  Ms. Zula concluded Coburn "is unable to work due to her arthritis condition."  (*Id*.)  She ordered repeat Vectra DA testing and prescribed Wellbutrin to address Coburn's worsening depression.  (*Id*.)  Coburn underwent the Vectra DA testing that day, which revealed a score of 43 indicating high moderate rheumatoid activity.  (Tr. 824.)

On July 14, 2015, Coburn returned to Dr. Sharpe.  (Tr. 647.)  Examination again revealed antalgic gait, neurologic loss of sensation, and +4/5 muscle strength.  (*Id*.)  Dr. Sharpe encouraged Coburn to start formal physical therapy.  (*Id*.)

Several days later, on July 16, 2015, Coburn presented to Dr. Heng for follow-up after visiting the ER for a possible stroke earlier that month.  (Tr. 669-670.)  Dr. Heng noted Coburn had been diagnosed with Bell's palsy, and was receiving outpatient treatment from neurology. (*Id*.)  On that date, Coburn rated her foot pain an 8 on a scale of 10.  (*Id*.)  Examination revealed left eyelid weakness but no facial drooping.  (*Id*.)  Dr. Heng increased Coburn's Wellbutrin dosage.  (*Id.*)

On August 5, 2015, Coburn presented to neurologist Joshua Sunshine, M.D., for follow-up regarding her Bell's palsy.  (Tr. 774-776.)  She complained of multiple symptoms, including neuropathy, tremor, fatigue, reduced vision, muscle pain and weakness, headache, memory problems, depression and anxiety.  (Tr. 774.)  Coburn denied difficulty performing daily activities, however.  (*Id*.)  Examination findings were normal, aside from "low amplitude high-

13

frequency tremor with hand extended." (Tr. 775-776.)  Dr. Sunshine assessed Bell's palsy, essential tremor, and polyneuropathy; and prescribed Mysoline. (*Id*.)

On August 12, 2015, Coburn presented to endocrinologist Brian Burtch, M.D., for treatment of her diabetes.[8] (Tr. 748.)  She reported neuropathic symptoms in her feet. (*Id*.) Examination revealed decreased sensation. (*Id*.)  Dr. Burtch assessed (1) type 2 diabetes with neuropathic symptoms uncontrolled; (2) hypertension; (3) dyslipidemia; (4) Hashimoto's disease; and (4) Vitamin B12 deficiency. (*Id*.)

Coburn returned to Dr. Foley on September 24, 2015. (Tr. 824-830.)  She was tearful and complained of joint pain, leg cramps with standing and walking, fatigue, dizziness, weakness, poor concentration and memory, headache, and dysesthesias and numbness in her feet. (Tr. 825-826, 828.)  Examination revealed reduced range of motion and tenderness in her fingers, wrists, right shoulder, hips, knees, and ankles; negative straight leg raise; tender points; no edema; normal muscle strength; and antalgic gait. (Tr. 828-829.)  Dr. Foley noted that: "Her ambulation is severely limited. She is working with podiatry and wears ankle braces.  She is unable to work due to all her arthritic conditions." (Tr. 829.)  He continued her on her medications, and recommended she begin IV Remicade infusions for her rheumatoid arthritis. (*Id*.)

On October 12, 2015, Coburn returned to Dr. Sunshine with complaints of hand tremor and "some tingling in her hands and feet." (Tr. 770-771.)  Examination revealed normal gait,

---

[8] The record reflects Coburn was diagnosed with type 2 diabetes in March 2010, and thereafter treated regularly with Dr. Burtch. (Tr. 757-758, 754, 753, 752, 751, 750, 749.) Dr. Burtch's treatment records indicate Coburn often complained of neuropathic symptoms in her hands and/or feet. (Tr. 750, 752.)

14

negative Romberg's, normal muscle bulk and tone, normal muscle strength, reduced sensation to Coburn's mid-thighs, and abnormal reflexes.  (Tr. 772.)  Dr. Sunshine noted improvement in Coburn's Bell's palsy, but continued problems with her neuropathy and tremor.  (*Id*.)  He ordered lab work and prescribed Pamelor.  (*Id*.)

On October 30, 2015, Coburn returned to Ms. Zula with complaints of continued joint pain, which she rated a 7 out of 10.  (Tr. 818-819.)  Examination revealed widespread tenderness and reduced range of motion in Coburn's joints, swelling in her fingers and wrists, negative straight leg raise, tender points, and antalgic gait.  (Tr. 820.)  Coburn underwent her first infusion on that date.  (Tr. 821.)

On November 30, 2015, Coburn reported no change in her symptoms after starting infusion therapy.  (Tr. 1094.)  She rated her pain a 7 out of 10, and complained of continued joint pain, fatigue, and morning stiffness.  (Tr. 1094-1096.)  Examination findings were the same as her previous visit.  (Tr. 1096.)  Ms. Zula noted that, despite treatment, Coburn's fatigue was "still profound."  (Tr. 1097.)  Coburn underwent her second infusion.  (*Id*.)

Coburn also presented to Dr. Sunshine on that same date.  (Tr. 1073-1074.)  She continued to complain of joint and muscle pain, numbness and tingling.  (*Id*.)  Dr. Sunshine ordered a skin biopsy of Coburn's left thigh, which showed "significantly reduced epidermal nerve fiber density, consistent with small fiber neuropathy."  (Tr. 1071, 1077.)

On January 7, 2016, Coburn reported to Ms. Zula that she had not noted any change in her symptoms as a result of the IV infusions.  (Tr. 1087-1093.)  She complained of joint pain, fatigue, morning stiffness, muscle cramps, weakness, dysesthesia and numbness in her feet, poor concentration and memory, and insomnia; and rated her pain a 7 on a scale of 10.  (Tr. 1087-

15

1089.)  Examination again revealed widespread tenderness and reduced range of motion in Coburn's joints, swelling in her fingers and wrists, negative straight leg raise, tender points, and antalgic gait.  (Tr. 1091-1092.)  Her affect was tearful.  (Tr. 1092.)  Ms. Zula noted that Coburn's (1) fibromyalgia symptoms were "debilitating" despite treatment; (2) fatigue was "still profound," and (3) ambulation was "severely limited."  (*Id.*)  She continued Coburn on her medications, and ordered further Vectra DA testing.  (*Id.*)  Coburn underwent the testing several days later, which revealed a score of 45 indicating high rheumatoid arthritis activity.  (Tr. 1105.)

Coburn returned to Dr. Sunshine on January 26, 2016.  (Tr. 1075-1076.)  She complained of continuing achiness in her hands and feet.  (*Id.*)  Examination findings were normal with the exception of abnormal reflexes and reduced pinprick sensation in Coburn's mid-thighs.  (*Id.*)  Dr. Sunshine continued Coburn on her medication.  (*Id.*)

Two days later, Coburn returned to Ms. Zula for IV infusion.  (Tr. 1082-1085.)  Ms. Zula noted Coburn had "a low grade fever on exam again today," as well as chronic fatigue.  (Tr. 1082-1083.)  Examination findings were the same as her previous visit.  (Tr. 1084.)

On March 24, 2016, Coburn returned to Dr. Foley.  (Tr. 1203-1209.)  Since her last infusion, she reported "less stiffness and less pain, especially in the feet, hands and wrists."  (Tr. 1203.)  However, she continued to complain of "significant ankle pain and swelling and finger IP pain."  (*Id.*)  Dr. Foley noted Coburn's ankle braces had not provided significant relief, and found "her ambulation is severely limited because of the ankles."  (*Id.*)  He also noted Coburn suffered from chronic low back pain, peripheral neuropathy, chronic fatigue, chronic depression, undifferentiated connective tissue disease with positive ANA, and rheumatoid arthritis.  (Tr. 1203, 1208.)  Examination revealed reduced range of motion in Coburn's fingers, wrists, right

16

shoulder, hips, knees, ankles and spine; tenderness in her PIP joints, right shoulder, hips, knees, and ankles; swelling in her ankles; tender points; antalgic gait; and tearful affect. (Tr. 1207-1208.)  Dr. Foley continued her on her medications, including her infusion therapy.  (Tr. 1209.)  The record reflects Coburn underwent an infusion that date.  (Tr. 1202.)

On May 19, 2016, Coburn again showed widespread tenderness and reduced range of motion in her joints, swelling in her wrists and fingers, tender points, and antalgic gait.  (Tr. 1197-1201.)   She received an IV infusion on that date.  (Tr. 1200.)

Several days later, on May 24, 2016, Coburn returned to Dr. Heng.  (Tr. 1141-1143.)  She reported difficulty walking, and rated her pain a 6 on a scale of 10.  (Tr. 1141.)  Examination revealed "no feeling at all [in her] bilateral feet." (Tr. 1142.)

Coburn returned to Ms. Zula on July 14, 2016.  (Tr. 1189-1196.)  She reported joint pain (particularly in her ankles and fingers), chronic fatigue, morning stiffness, weakness, dysesthesia and numbness in her feet, poor concentration and memory, muscle cramps, and insomnia.  (*Id.*)  Coburn was tearful on examination, and showed widespread tenderness and reduced range of motion in her joints, tender points, and antalgic gait.  (Tr. 1193-1194.)  She underwent an IV infusion that date, and Ms. Zula ordered further Vectra DA testing.  (Tr. 1195.)  Coburn underwent the testing on July 20, 2016, which revealed a score of 43 indicating moderate rheumatoid arthritis activity.  (Tr. 1218.)

On September 8, 2016, Coburn presented to Dr. Foley.  (Tr. 1180-1186.)  He noted that, even with six doses of infusion therapy, Coburn "still has significant ankle pain with swelling, and moderate finger PIP, MCP and wrist swelling with pain."  (Tr. 1180.)  With regard to her connective tissue disorder with positive ANA, Dr. Foley found Coburn "still has moderate joint

17

pain and swelling as above and moderate fatigue." (*Id.*) Examination findings were the same as her previous visit with Ms. Zula. (Tr. 1184-1185.) Dr. Foley noted Coburn "still experiences moderately severe pain associated with synovitis," noting her "ambulation is severely limited" and "she is unable to work due to all her arthritic symptoms." (Tr. 1186.) He recommended a change in Coburn's biologic treatment "because of the poor response to anti-TNF treatment so far." (Tr. 1185.) He advised Coburn to switch from IV Simponi Aria infusions to IV Orencia infusions, which she agreed to do. (Tr. 1186.) Coburn underwent an IV Orencia infusion on October 3, 2016. (Tr. 1178.)

Coburn returned to Dr. Sunshine on October 7, 2016. (Tr. 1159-1160.) She reported reduced tremors in her hands bilaterally, but increased tingling in her feet. (*Id.*) Physical examination findings were normal. (*Id.*)

On October 17, 2016 and November 3, 2016, Coburn returned to Ms. Zula for IV infusions of Orencia. (Tr. 1170-1174, 1293-1297.) On both dates, she complained of chronic joint pain, chronic fatigue, and morning stiffness. (*Id.*) In addition, during her November 2016 visit, Coburn also complained of right tarsal joint swelling and pain. (Tr. 1296.) Examination during both visits revealed reduced range of motion and tenderness in Coburn's joints, tender points, and antalgic gait. (Tr. 1172-1173, 1295-1296.)

Coburn returned to Dr. Sharpe on November 3, 2016 for treatment of right foot pain. (Tr. 1248.) Dr. Sharpe fitted Coburn with a short pneumatic boot. (*Id.*) He assessed arthralgia and swelling of right foot. (*Id.*) Coburn underwent x-rays of her right foot that day, which revealed mild degenerative joint disease. (Tr. 1304.) Coburn returned to Dr. Sharpe later month, at which time she underwent a cortisone injection in her right foot due to continued right foot pain

18

and swelling. (Tr. 1246.)

On November 4, 2016, Coburn returned to Dr. Heng. (Tr. 1250-1251.) She reported difficulty walking and rated her pain an 8 on a scale of 10. (*Id*.) On examination, Dr. Heng noted Coburn had "no feeling at all [in her] bilateral feet." (*Id*.)

On December 2, 2016, Coburn returned to Ms. Zula. (Tr. 1285-1292.) She indicated she had not noted any improvement in her symptoms since her IV Orencia infusions, and continued to complain of joint pain and swelling, chronic fatigue, and morning stiffness. (*Id*.) Coburn rated her pain an 8 on a scale of 10. (Tr. 1286.) Examination revealed reduced range of motion, tenderness, and swelling in Coburn's joints, tender points, and antalgic gait. (Tr. 1290.) Ms. Zula ordered Vectra DA testing, which Coburn underwent on December 8, 2016. (Tr. 1301.) That testing revealed a score of 46, indicating high rheumatoid arthritis activity. (*Id*.)

### 2. Mental Impairments

As noted above, in February 2012, Coburn presented to Dr. Foley with multiple symptoms, at which time he assessed "probable depression." (Tr. 917-918.) In July 2012, Dr. Foley noted Coburn presented with a "melancholy affect." (Tr. 913-914.) Over a year later, in December 2013, Coburn complained of crying spells, "feeling low," poor concentration and memory, fatigue, and insomnia. (Tr. 414-415.) Dr. Foley prescribed Cymbalta to address both her pain and depression, and "strongly encouraged her to seek counseling and further treatment with psychiatry." (Tr. 418.)

In March 2014, Ms. Zula diagnosed depression and encouraged Coburn to undergo a psychiatric evaluation. (Tr. 412.) Coburn was "reluctant" and indicated Cymbalta was helping "somewhat." (*Id*.) The record reflects Coburn continued to complain of (and carried a diagnosis

of) depression throughout 2014 and early 2015.  (Tr. 406, 400, 394, 388, 381, 375.)  Coburn was

urged to seek psychiatric care, but was "reluctant to see more specialists due to cost."  (Tr. 394,

388, 381, 375.)

On April 23, 2015, Coburn presented to primary care physician Dr. Heng to discuss her

depression and anxiety.  (Tr. 678-679.)  In response to depression screening, Coburn indicated

that "nearly every day" she (1) had little interest or pleasure in doing things; (2) felt down,

depressed or hopeless; (3) had trouble falling or staying asleep; (4) felt tired or had little energy;

and (5) had trouble concentrating on things.  (*Id*.)  She also stated that, more than half the time,

she had thoughts that she would be better off dead or of hurting herself in some way.  (*Id*.)  Dr.

Heng interpreted Coburn's responses as indicating severe depression.  (*Id*.)  She diagnosed

depression, increased Coburn's Cymbalta dosage, and advised her to continue taking Trazodone.

(*Id.*)

On February 3, 2016, Coburn underwent a psychological intake assessment with Ken

Gerstenhaber, Ph.D.  (Tr. 1065-1066.)  She complained of depression due to her pain and

limitations, and reported symptoms including social withdrawal, crying "a lot," lack of

motivation, worrying, and feelings of hopelessness.  (*Id*.)  On mental status examination, Coburn

had normal behavior but moved "very slowly due to pain."  (Tr. 1066.)  Her affected/mood was

blunted/flat, depressed, and anxious, and her speech was soft and slowed.  (*Id*.)  She was fully

oriented and her thought content was normal, but she had poor concentration, was forgetful, and

had poor judgment/insight.  (*Id*.)  Dr. Gerstenhaber diagnosed major depression, and assessed a

Global Assessment of Functioning of 40 indicating major impairment.[9]  (Tr. 1067.)  He

recommended individual therapy, and medication management with psychiatrist Diane Eden,

M.D.  (*Id*.)

Coburn returned to Dr. Gerstenhaber on February 17, 2016.  (Tr. 1064.)  Mental status

examination revealed flat affect and "minimal communication."  (*Id*.)  Dr. Gerstenhaber again

assessed a GAF score of 40.  (*Id*.)

On February 23, 2016, Coburn presented to Dr. Eden.  (Tr. 1052-1055.) She complained

of gradually worsening depression and anxiety, and reported symptoms including "anxious

feelings," shaking, forgetfulness, sadness, tearfulness, and low self-esteem.  (*Id*.)  Mental status

examination revealed a flat affect, sad mood, apathetic motor activity, slowed speech and rate of

thoughts, and fair judgment and insight.  (*Id*.)  Coburn's concentration was within normal limits,

and her thought content and thought processes were appropriate, relevant, and coherent.  (*Id*.)

Dr. Eden assessed major depressive disorder, recurrent, moderate; increased her Cymbalta

dosage; and continued her on Wellbutrin.  (*Id*.)

Coburn returned to Dr. Eden on March 23, 2016.  (Tr. 1139.)  She was "improved but

still symptomatic."  (*Id*.)  Examination revealed flat affect, sad mood, normal behavior, slowed

---

[9] The GAF scale reports a clinician's assessment of an individual's overall level
of functioning.  An individual's GAF is rated between 0-100, with lower numbers
indicating more severe mental impairments. A GAF score between 31 and 40 indicates
some impairment in reality testing or communication or major impairment in several
areas such as work or school, family relations, judgment, thinking or mood.  A score
between 41 and 50 indicates serious symptoms or any serious impairment in social,
occupational or school functioning. A recent update of the DSM eliminated the GAF
scale because of "its conceptual lack of clarity . . . and questionable psychometrics in
routine practice."  *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5)
at 16 (American Psychiatric Ass'n, 5th ed., 2013).

speech, appropriate language, intact short term memory, relevant and coherent thought process, and fair judgment and insight. (*Id*.) Dr. Eden switched Coburn from Cymbalta to Lexapro, and continued her on Wellbutrin. (*Id*.) The following month, Coburn reported worsening depression and was tearful and "focused on pain." (Tr. 1138.) Dr. Eden switched her back to Cymbalta. (*Id.*)

On May 23, 2016, Coburn had improved mood but her response to medication was "not optimal." (Tr. 1137.) Examination revealed flat affect, sad mood, normal behavior, apathetic psychomotor activity, slowed speech and rate of thought, appropriate language, intact short term memory, relevant and coherent thought process, average intelligence, and fair judgment and insight. (*Id*.) Dr. Eden continued Coburn on her medications. (*Id*.)

On July 18, 2016, Coburn was described as "unstable" and having "difficulty functioning." (Tr. 1136.) Examination findings were the same as her previous visit. (*Id*.) Dr. Eden assessed major depressive disorder, recurrent, severe without psychotic features. (*Id*.) She continued Coburn on her medications, and provided information regarding Transcranial Magnetic Stimulation ("TMS").[10] (*Id.*)

On September 23, 2016, Coburn reported increased symptoms and was again described as " unstable." (Tr. 1236.) Examination findings were the same as her previous visits. (Tr. 1237-1238.) Coburn declined TMS therapy and Dr. Eden continued her on her medications. (*Id.*)

---

[10] Transcranial Magnetic Stimulation "is a noninvasive procedure that uses magnetic fields to stimulate nerve cells in the brain to improve symptoms of depression. TMS is typically used when other depression treatments haven't been effective." *See* https://www.mayoclinic.org/tests-procedures.

On October 11, 2016,[11] Dr. Eden completed an Assessment of Ability to do Work-Related Activities (Mental).  (Tr. 1226-1227.)  She concluded Coburn was moderately limited in her abilities to: (1) relate to other people; (2) sustain a routine without special supervision; (3) perform activities within a schedule, maintain regular attendance, and be punctual; (4) respond to customary work pressures; (5) perform complex, repetitive or varied tasks; and (6) behave in an emotionally stable manner.  (*Id*.)  Dr. Eden also concluded Coburn would likely be absent from work two times per month as a result of her impairments or treatment.  (*Id*.)

Coburn returned to Dr. Eden on November 21, 2016, reporting no change in her symptoms.  (Tr. 1231-1235.)  Examination revealed flat affect, sad mood, normal behavior, apathetic psychomotor activity, slowed speech and rate of thought, appropriate language, intact memory, relevant and coherent thought process, average intelligence, and fair judgment and insight.  (Tr. 1232-1233.)  Dr. Coburn continued Coburn on her medications.  (Tr. 1234.)

**C.	State Agency Reports**

**1.	Physical Impairments**

On May 26, 2015, state agency physician Venkatachala Sreenivas, M.D., reviewed Coburn's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment.  (Tr. 101-103.)  Dr. Sreenivas found Coburn could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for about 4 hours in an 8 hour work day; and sit for about 6 hours in an 8 hour workday.  (*Id*.)  She further concluded Coburn could frequently balance, and occasionally stoop, kneel, crouch, crawl, push and pull with her right

---

[11] Dr. Eden's opinion is dated October 11, 2011.  (Tr. 1226-1227.)  The Court assumes, however, that this is an error since, in the opinion, Dr. Eden states that she first saw Coburn in February 2016 and has seen her for less than a year.  (*Id*.)

23

upper extremity and bilateral lower extremities, and climb ramps and stairs.  (*Id.*)  Dr. Sreenivas

found Coburn could never climb ladders, ropes, and scaffolds.  (*Id.*)  With regard to her

manipulative limitations, she found Coburn was limited to frequent fingering and handling

bilaterally, and occasional overhead reaching with her right upper extremity.  (*Id.*)  Finally, Dr.

Sreenivas found Coburn should avoid concentrated exposure to extreme cold, and avoid all

exposure to hazards, unprotected heights, open machinery, and commercial driving.[12]  (*Id.*)

On August 13, 2015, state agency physician Leon Hughes, M.D., reviewed Coburn's

medical records and completed a Physical RFC Assessment.  (Tr. 115-118.)  Dr. Hughes reached

the same conclusions as Dr. Sreenivas.  (*Id.*)

### 2.    Mental Impairments

On May 28, 2015, state agency psychologist Mary K. Hill, Ph.D., reviewed Coburn's

medical records and completed a Psychiatric Review Technique ("PRT").  (Tr. 99.)  Dr. Hill

found Coburn had failed to establish a mental medically determinable impairment, explaining

"claimant states she is suffering from depression, however she has no [mental health] treating

source and no formal [diagnosis] of this condition."  (*Id.*)

On October 8, 2015, state agency psychologist Bonnie Katz, Ph.D., reviewed Coburn's

medical records and completed a PRT and Mental RFC Assessment.  (Tr. 114, 118-120.)  In the

PRT, Dr. Katz found the evidence was insufficient to assess Coburn's allegations of mental

impairments from Coburn's December 22, 2009 alleged onset date through December 15, 2013.

---

[12] In the narrative section of her opinion, Dr. Sreenivas noted that "[t]he earliest
documentation of impairment is from 3/27/14.  In view of the severity of the condition,
[alleged onset date] is implied from 12/27/13 (3 months prior to the earliest
documentation)."  (Tr. 103.)

(Tr. 114.)  However, she found that, from December 16, 2013 forward, the evidence established that Coburn had moderate restrictions in her activities of daily living, social functioning, and concentration, persistence, or pace.  (*Id*.)

In the Mental RFC Assessment (which also covered the time period from December 16, 2013 to the date of her opinion), Dr. Katz found Coburn was moderately limited in her abilities to (1) understand, remember, and carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) sustain an ordinary routine without special supervision; (4) work in coordination with or in proximity to others without being distracted by them; (5) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (6) interact appropriately with the general public; (7) accept instructions and respond appropriately to criticism from supervisors; (8) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (9) respond appropriately to changes in the work setting; and (10) set realistic goals or make plans independently of others.  (Tr. 118-120.)

Dr. Katz explained Coburn was "able to perform simple tasks not requiring her to sustain close consistent attention/concentration over an extended period, nor to meet fast-paced performance demands, in a setting where others can provide redirection/reassurance when needed."  (Tr. 119.)  She found Coburn was able to interact with others in a work setting on a limited, brief, and superficial basis, and was able to adapt to infrequent changes in routine that are introduced and explained fully, in advance.  (Tr. 119-120.)

**D.     Hearing Testimony**

During the December 21, 2016 hearing, Coburn testified to the following:

- She lives in a "manufactured home" (or trailer) with her husband, 23 year old daughter, and 5 month old granddaughter.  (Tr. 41, 65-66.)  She graduated from high school, and took several childcare development classes.  (Tr. 52.)  She has a driver's license but had not driven for the past year and a half due to her chronic pain.  (Tr. 43.)

- She stopped working in December 2009.  (Tr. 45.)  Prior to that, she worked as a teacher's aide at several day care facilities.  (Tr. 46.)  She worked with both toddlers and infants.  (Tr. 47.)  It was a very physically demanding job that involved lifting up to 35 pounds, stooping, bending, "running around a lot," sitting on the floor, and stocking supplies.  (Tr. 48-49.)

- She is no longer able to work because she is weak and in severe pain.  (Tr. 50.)  She has experienced daily pain in her back, arms, elbows, hands, hips, knees, and feet since approximately 2007 or 2008.  (Tr. 51-52.)  With regard to her back pain, she suffers from muscle spasms and shooting pains.  (Tr. 57.)  She experiences chronic, daily foot pain "24/7," making it very difficult for her to walk.  (Tr. 54, 79.)  She also has neuropathy in her feet, which feels like "someone just bashed [her] with a hammer."  (Tr. 79.)  Her knees are weak and sometimes buckle, causing her to fall.  (Tr. 55, 83.)  She experiences swelling in her hands, fingers, ankles, feet and knees.  (Tr. 76.)  She has tremors in her hands and her fingertips get "really numb," causing her to drop things.  (Tr. 52, 72, 79-80, 92.)  She cannot reach overhead or carry her grandchildren.  (Tr. 51, 69, 79-80.)

- In addition, she is often weak and "very, very tired."  (Tr. 78.)  She has morning stiffness for at least an hour each day, has no strength, and cannot support herself.  (Tr. 78, 83.)  She explained: "I'm weak and tired and I think I'm just tired of everything always."  (Tr. 80.)

- Treatment has included medication, physical therapy, injections, custom orthotics, and infusions.  (Tr. 54-61.)  The medication does provide some relief but "it doesn't take it all away."  (Tr. 61.)  She gets infusions once per month.  (Tr. 62.)  Each session takes 2 to 2 ½ hours.  (Tr. 62-63.)  Afterwards, she feels nauseous for several days.  (*Id.*)  She uses a cane but it was not prescribed by her doctor.  (Tr. 82.)

- She also suffers from depression.  (Tr. 63.)  She sees both a psychiatrist and counselor.  (*Id.*)  Her symptoms include stress, crying spells, forgetfulness, and difficulty concentrating.  (Tr. 64, 77, 92.)

- She goes shopping with her husband but usually rides in the cart.  (Tr. 71.)  Her husband cooks dinner, although she does prepare some meals in the microwave.  (Tr. 72.)  She does not clean or do dishes because standing is difficult for her.

26

(*Id*.) She cannot vacuum or perform household chores. (Tr. 73.) Her sister does the laundry, and her husband does the yard work. (*Id*.) Her daughter helps her get dressed and shampoo her hair. (Tr. 51, 79-80.) She uses a shower chair, and almost always needs to lean on things when walking. (Tr. 51, 83.)

- On a typical day, it takes her a little while to get up and get moving. (Tr. 73.) She will then brush her teeth and take her medicine. (*Id*.) She sits on the couch, watches TV, and will sometimes give her baby granddaughter a bottle. (Tr. 74.) She does not really go anywhere except the doctor's office. (Tr. 74-75.) She does not have any friends or hobbies. (Tr. 70-71.) She goes to church on Sundays. (Tr. 70.)

The VE testified Coburn had past work as a child daycare center worker (light performed as medium, semi-skilled, SVP 4) and teacher aide II (light performed as medium, semi-skilled, SVP 3). (Tr. 86-87.) The ALJ then posed the following hypothetical question:

> [I]f you can please assume an individual of claimant's age, education, and work experience and also assume that this individual can lift, carry, push, and pull occasionally 20 pounds; frequently 10 pounds. Stand and/or walk for four hours out of an eight-hour workday; sit for six hours out of an eight-hour workday; occasionally push and pull with the right upper extremity and bilateral lower extremities. Occasionally climb ramps and stairs; never climb ladders, ropes, and scaffolds; frequently balance; occasionally stoop, kneel, crouch, and crawl; have occasional right overhead reaching; have frequent bilateral handling and fingering; have frequent exposure to extreme cold; never to be exposed to hazards. This individual is also limited to perform simple routine tasks; have occasional interactions with supervisors, coworkers, and the public; and is also limited to occasional routine workplace changes.

(Tr. 87.)

The VE testified the hypothetical individual would not be able to perform Coburn's past work as child daycare center worker or teacher aide II, but would be able to perform other representative jobs in the economy, such as garment sorter (light, unskilled, SVP 2), checker (light, unskilled, SVP 2), and marker (light, unskilled, SVP 2). (Tr. 88.)

Coburn's counsel then asked the VE to assume the ALJ's first hypothetical with the additional limitation that the individual "would be absent from the workplace two days per

27

month on a consistent basis." (Tr. 89.) The VE testified there would be no work for such an

individual. (*Id*.) Counsel then asked the VE to assume the hypothetical person were to be off

task 20% of a workday. (Tr. 90.) The VE testified there would not be any employment available

for such an individual. (*Id*.)

Lastly, Coburn's counsel asked the VE the following:

> Q:    If for the -- my final hypothetical, if the individual were so limited as the
>        Court found in the first hypothetical and there were also a requirement that
>        the work be done in a setting where coworkers can provide redirection and
>        reassurance when needed to the hypothetical individual, would that rise to
>        the level of an accommodation in your opinion?
>
> A:    Well, that's I guess a little vague. I will phrase it this way. Based on my
>        experience, there is a level of tolerance for a person that would need say
>        redirection or retraining or in this case reassurance within the probationary
>        period. After that time, typically it's not an expectation that the person
>        would require that particularly from coworkers. That would be normally
>        supervisory position that would do that. But based on that depending on the
>        degree of the redirection or reassurance, that certainly could be work
>        preclusive.
>
> Q:    So, work preclusive if after the probationary period?
>
> A:    Yes, as I stated. Once the probationary period is over, I'm not saying that
>        the employer or fellow employees would abandon the person if they have
>        questions or things of that nature. But if it would be something that would
>        require that redirection on a continuous and habitual basis, I believe that it
>        certainly would be problematic and depending on the -- if it was one
>        question a day or if it was one time per day, that would most likely be
>        tolerated. But if it was something that was, you know, say every couple
>        hours or three or four times throughout the day, I think that would certainly
>        be problematic.

(Tr. 90-91.)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the

time of disability and must prove an inability to engage "in substantial gainful activity by reason

28

of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her

29

past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Coburn was insured on her alleged disability onset date, December 22, 2009, and remained insured through December 31, 2014, her date last insured ("DLI.") (Tr. 15.) Therefore, in order to be entitled to POD and DIB, Coburn must establish a continuous twelve month period of disability commencing between these dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant last met the insured status requirements of the Social Security Act on December 31, 2014.

2.   The claimant did not engage in substantial gainful activity during the period from her alleged onset date of December 22, 2009 through her date last insured of December 31, 2014 (20 CFR 404.1571 et seq.)

3.   Through the date last insured, the claimant had the following severe impairments: spine disorders, dysfunction of the major joints, inflammatory arthritis, depression, diabetes mellitus, bilateral carpal tunnel syndrome, undifferentiated connective tissue disease, and obesity (20 CFR 404.1520(c)).

4.   Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5.   After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant can stand/walk for 4 hours in an 8-hour workday, and can occasionally push/pull with the right upper extremity and bilateral lower extremities. She can never climb ladders/ropes/scaffolds, and can occasionally climb ramps and scaffolds. The claimant can frequently balance, and can occasionally stoop, kneel, crouch,

and crawl. She can occasionally perform right overhead reaching and frequent bilateral handing/fingering. The claimant can have frequent exposure to extreme cold, and should never have exposure to hazards. In addition, the claimant is limited to performing simple, routine tasks, can have occasional interaction with supervisors, co-workers, and the public, and is limited to occasional routine workplace changes.

6. Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on June ** 1968 and was 46 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from December 22, 2009, alleged onset date, through December 31, 2014, the date last insured (20 CFR 404.1520(g)).

(Tr. 15-26.)

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);

*White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281

(6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### *Listing 14.06A*

Coburn asserts the ALJ erred in determining she did not meet the requirements of Listing 14.06A for Undifferentiated Connective Tissue Disease ("CTD").  (Doc. No. 16 at 22-24.)  She maintains her CTD "was diagnosed via clinical and serological findings, including antinuclear antibody or ANA, testing as early as December 9, 2009."  (*Id*. at 24.)  Citing extensively to the record, Coburn further argues her CTD meets the requirements of Listing 14.06A because (1) it involves four body systems (i.e., her musculoskeletal, neurologic, hematologic, and mental systems), at least one of which to a moderate level of severity ; and (2)

33

she has consistently exhibited at least two of the required constitutional signs or symptoms (i.e., severe fatigue, malaise, and fever).  (*Id*.)  Coburn asserts that, while the ALJ acknowledged Listing 14.06A at step three, the decision's "failure to actually analyze this listing resulted in a decision that is not supported by substantial evidence and does not permit meaningful judicial review."  (*Id.*)

The Commissioner argues Coburn did not meet her burden to prove that met Listing 14.06A.  (Doc. No. 19 at 6-8.)  She asserts that "[t]hough the ALJ's discussion [at step three] was brief, it was sufficient."  (*Id*. at 6.)  The Commissioner argues Coburn is relying on her subjective allegations regarding her neurologic condition and other symptoms, rather than objective medical findings, to demonstrate she met Listing 14.06A.  (*Id*. at 7.)  She maintains Coburn's argument fails because the ALJ properly discounted the reliability of her subjective allegations, a finding which Coburn does not challenge herein.  (*Id*.)  The Commissioner also argues Coburn's allegations of fatigue and malaise are based principally on her subjective allegations, arguing "Plaintiff ignores that the ALJ reduced the weight of her subjective complaints, which directly undermines her allegations of fatigue, malaise and the severity of the involvement of her body systems."  (*Id*. at 8.)

At the third step in the disability evaluation process, a claimant will be found disabled if her impairment meets or equals one of the Listing of Impairments.  *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 Fed. Appx. 488, 491 (6th Cir. 2010).  The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age,

education, or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a). Essentially, a claimant who meets the requirements of a Listed Impairment, as well as the durational requirement, will be deemed conclusively disabled and entitled to benefits.

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3). It is the claimant's burden to bring forth evidence to establish that her impairments meet or are medically equivalent to a listed impairment. *See e.g. Lett v. Colvin*, 2015 WL 853425 at * 15 (N.D. Ohio Feb. 26, 2015). A claimant must satisfy all of the criteria to "meet" the listing. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). A claimant is also disabled if her impairment is the medical equivalent of a listing, 20 C.F.R. §§ 404.1525(c)(5), 416.925(c)(5), which means it is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. §§ 404.1526(a), 416.926(a).

Where the record raises a "substantial question" as to whether a claimant could qualify as disabled under a listing, an ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment. *See Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411, 414-15 (6th Cir. 2011). In order to conduct a meaningful review, the ALJ must make sufficiently clear the reasons for her decision. *Id.* at 416-17. *See also Harvey v. Comm'r of Soc. Sec.*, 2017 WL 4216585 at * 5 (6th Cir. March 6, 2017) ("In assessing whether a claimant meets a Listing, the ALJ must 'actually evaluate the evidence,' compare it to the requirements of the

35

relevant Listing, and provide an 'explained conclusion, in order to facilitate meaningful judicial review.'") (quoting *Reynolds*, 424 Fed. Appx. at 416); *Joseph v. Comm'r of Soc. Sec.*, 2018 WL 3414141 at * 4 (6th Cir. July 13, 2018) (same). *See also Snyder v. Comm'r of Soc. Sec.*, 2014 WL 6687227 at * 10 (N.D. Ohio Nov. 26, 2014) ("Although it is the claimant's burden of proof at Step 3, the ALJ must provide articulation of his Step 3 findings that will permit meaningful review. . . This court has stated that 'the ALJ must build an accurate and logical bridge between the evidence and his conclusion.'") (quoting *Woodall v. Colvin*, 2013 WL 4710516 at *10 (N.D. Ohio Aug.29, 2013).

Here, Coburn argues the ALJ erred in finding she did not meet the requirements of Listing 14.06A. That Listing defines Undifferentiated and Mixed Connective Tissue Disease as follows:

> **5. Undifferentiated and mixed connective tissue disease (14.06).**
>
> a. General. This listing includes syndromes with clinical and immunologic features of several autoimmune disorders, but which do not satisfy the criteria for any of the specific disorders described. For example, you may have clinical features of SLE and systemic vasculitis, and the serologic (blood test) findings of rheumatoid arthritis.
>
> b. Documentation of undifferentiated and mixed connective tissue disease. **Undifferentiated connective tissue disease is diagnosed when clinical features and serologic (blood test) findings, such as rheumatoid factor or antinuclear antibody (consistent with an autoimmune disorder) are present but do not satisfy the criteria for a specific disease**. Mixed connective tissue disease (MCTD) is diagnosed when clinical features and serologic findings of two or more autoimmune diseases overlap.

20 CFR Part 404, Subpart P, Appendix 1, Listing 14.00D5 (emphasis added). To satisfy the requirements of Listing 14.06A, a claimant must have undifferentiated or mixed connective tissue disease as described above and the following:

**14.06 Undifferentiated and mixed connective tissue disease**. As described in 14.00D5. With:

A. Involvement of two or more organs/body systems,[13] with:

1. One of the organs/body systems involved to at least a moderate level of severity; and

2. At least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss).

20 CFR Part 404, Subpart P, Appendix 1, Listing 14.06A.  Listing 14.00C2 defines

constitutional symptoms or signs, as follows:

2. Constitutional symptoms or signs, as used in these listings, means severe fatigue, fever, malaise, or involuntary weight loss. Severe fatigue means a frequent sense of exhaustion that results in significantly reduced physical activity or mental function. Malaise means frequent feelings of illness, bodily discomfort, or lack of well-being that result in significantly reduced physical activity or mental function."

20 CFR Part 404, Subpart P, Appendix 1, Listing 14.00C2.

The record reflects Coburn argued that she met the requirements of Listing 14.06A at

both the hearing and in her administrative briefing before the ALJ.  (Tr. 39-40, 311-313.)  After

finding that Coburn's undifferentiated connective tissue disease constituted a severe impairment

at step two, the ALJ addressed Listing 14.06A at step three as follows:

The claimant's impairments also does [sic] not meet the severity requirements for

---

[13] Examples of body systems include the following: "Musculoskeletal (heel enthesopathy), ophthalmologic (iridocyclitis, keratoconjunctivitis sicca, uveitis), pulmonary (pleuritis, pulmonary fibrosis or nodules, restrictive lung disease), cardiovascular (aortic valve insufficiency, arrhythmias, coronary arteritis, myocarditis, pericarditis, Raynaud's phenomenon, systemic vasculitis), renal (amyloidosis of the kidney), hematologic (chronic anemia, thrombocytopenia), neurologic (peripheral neuropathy, radiculopathy, spinal cord or cauda equina compression with sensory and motor loss), mental (cognitive dysfunction, poor memory), and immune system (Felty's syndrome (hypersplenism with compromised immune competence))." 20 CFR Part 404, Subpart P, Appendix 1, Listing 14.00D6(e)(iii).

connective tissue disease under Listing 14.06.  The claimant's medical record does not indicate documented undifferentiated and mixed connective tissue disease that involves two or more organs/body systems, and does include medically-documented repeated manifestations of connective tissue disease.

(Tr. 19.)

The Court finds the ALJ failed to sufficiently address whether Coburn met the requirements of Listing 14.06A.  Although the ALJ briefly acknowledges this Listing at step three, she fails, at any point in the decision, to 'actually evaluate the evidence,' compare it to the specific requirements of Listing 14.06A, and provide an 'explained conclusion" as to why the evidence failed to satisfy those requirements.  *See Harvey*, 2017 WL 4216585 at * 5; *Reynolds*, 424 Fed. Appx. at 416.  This is problematic because, as discussed below, there is medical evidence in the record that raises a substantial question as to whether or not Coburn's undifferentiated CTD meets the requirements of Listing 14.06A.

Listing 14.06A first requires a claimant to have been diagnosed with undifferentiated or mixed connective tissue disease as defined in Listing 14.00D5.  As noted above, that section provides that "undifferentiated connective tissue disease is diagnosed when clinical features and serologic (blood test) findings, such as rheumatoid factor or antinuclear antibody (consistent with an autoimmune disorder) are present but do not satisfy the criteria for a specific disease."  20 CFR Part 404, Subpart P, Appendix 1, Listing 14.00D5.  Here, the record reflects serologic testing showed Coburn exhibited positive antinuclear antibody (or "ANA") as early as February 2010.  (Tr. 935-936.)  After considering and ruling out other possible disorders (Tr. 917-918, 913-914), Dr. Foley formally diagnosed Coburn with undifferentiated connective tissue disease with positive ANA in February 2013.  (Tr. 907-908.)  Treatment records indicate Coburn thereafter continued to carry this diagnosis throughout the remainder of the relevant time period.

38

(Tr. 424, 412, 406, 400, 374, 829, 1092, 1208, 1194, 1185, 1291.)

Listing 14.06A next requires "involvement of two or more organs/body systems, with *
* * [o]ne of the organs/body systems involved to at least a moderate level of severity." 20 CFR
Part 404, Subpart P, Appendix 1, Listing 14.06A.  The regulations provide examples of "body
systems," including neurologic, musculoskeletal, hematologic, and mental.  *See* 20 CFR Part
404, Subpart P, Appendix 1, Listing 14.00D6(e)(iii).  Here, Coburn argues, and the undersigned
agrees, that the medical evidence raises a substantial question as to whether she has shown
"involvement of two or more" body systems with one of them involved to "at least a moderate
level of severity."

With regard to Coburn's neurological body system, the record reflects Coburn
repeatedly reported significant neuropathic symptoms, including pain, burning, tingling,
numbness, and dysesthesia in her bilateral feet.  *See e.g.*, Tr. 921-922, 917-918, 909-910, 390,
372, 774-776, 748, 770-772, 1142, 1159-1160, 1250-1251.  Dr. Foley formally diagnosed
Coburn with peripheral neuropathy in October 2011 and ordered an EMG/NCS several months
later, which could not rule out small fiber neuropathy.  (Tr. 921-922, 917-918, 1050.)  Coburn
continued to carry a diagnosis of peripheral neuropathy throughout the relevant time period and
was treated for this condition by neurologist Dr. Sunshine beginning in August 2015.  (Tr. 774-
776.)  That same month, endocrinologist Dr. Burtch noted Coburn had type 2 diabetes with
"uncontrolled" neuropathic symptoms and decreased sensation in her feet.  (Tr. 748.)  In
November 2015, Dr. Sunshine ordered a skin biopsy of Coburn's thigh, which confirmed
"significantly reduced epidermal nerve fiber density, consistent with small fiber neuropathy."
(Tr. 1071.)  Treatment records from Dr. Heng from May and November 2016 indicate Coburn

had "no feeling at all [in her] bilateral feet."  (Tr. 1142, 1250-1251.)

Coburn also received neurological treatment for Bell's Palsy and hand tremors.  In July 2015, Coburn presented to the ER for treatment of a possible stroke.  (Tr. 669-670.)  She was diagnosed with Bell's Palsy, and subsequently followed by Dr. Sunshine, who confirmed her Bell's Palsy diagnosis and also assessed essential tremor and polyneuropathy.  (Tr. 775-776.) Subsequent treatment records from Dr. Sunshine note continued hand tremors and neuropathic symptoms despite medication.  (Tr. 770-772, 1159.)

The ALJ decision does not address the medical evidence regarding Coburn's neurologic conditions at step three, thus providing the Court with no explanation as to why the ALJ implicitly concluded the evidence was insufficient to demonstrate involvement of Coburn's neurological body system to at least a moderate level of severity for purposes of Listing 14.06A. Moreover, while the ALJ discussed some of the evidence regarding Coburn's neuropathy at step four, that discussion is perfunctory[14] and fails to address the majority of the medical evidence cited above, including the biopsy results confirming small fiber neuropathy and the medical evidence regarding Coburn's hand tremors.  (Tr. 23.)  In sum, nowhere in the decision does the ALJ discuss the medical evidence regarding Coburn's neurologic body system in the context of

---

[14] The ALJ's entire discussion of Coburn's neuropathy at step four is as follows: "Concerning the claimant's diabetes, the record supports that the claimant has a history of diabetes, and that the claimant has neuropathy that may be related to her diabetes (Exhibit 10F/5; 37F/3).  Examinations noted some achiness in her hands and feet (Exhibit 23F/1).  The claimant is taking medications for her diabetes, and recent treatment notes after the date last insured indicate that the claimant's diabetes is poorly controlled after her insurance stopped covering some treatment (Exhibit 37F/3).  The claimant's diabetic neuropathy has been taken into account in the residual functional capacity through the light exertional level and environmental limitations." (Tr. 23.)

40

Listing 14.06A or otherwise analyze why such evidence is insufficient to show involvement to "at least a moderate level of severity."

The same is true with regard to the medical evidence relating to Coburn's musculoskeletal body system. Treatment records reflect Coburn consistently reported chronic foot, knee, and lower back pain during the relevant time period. *See, e.g.*, Tr. 940, 921-924, 909-910, 420-425, 408-412, 383-388, 377-379, 363-365, 649-650, 824-829, 1203-1209, 1197-1201, 1180-1186.) On physical examination, Coburn's doctors documented reduced range of motion in her knees, ankles, shoulder, and spine; tenderness; swelling; and tender points. (Tr. 935, 929, 933-934, 931-932, 927, 923-924, 917-918, 913-914, 909-910, 907-908, 423, 417-418, 411-412, 405-406, 399-400, 393-394, 387, 374, 367, 834-835, 828, 820, 1096, 1091-1092, 1207-1208, 1199, 1193-1194, 1184-1185, 1172-1173, 1295-1296, 1290.) Her physicians also often noted antalgic gait, knee crepitus, and/or reduced muscle strength. (Tr. 931-932, 929, 927, 909-910, 400, 394, 387, 649, 835, 647, 829, 820, 1096, 1092, 1208, 1199, 1194, 1185, 1173, 1296, 1290.) Coburn was diagnosed with degenerative disc disease in October 2011, and with degenerative joint disease of the foot and ankle in April 2015. (Tr. 922, 649-650.) Treatment included pain medication, ankle braces, and cortisone injections. (Tr. 649-650, 1248.) In September 2015, Dr. Foley found Coburn's ambulation was "severely limited" due to her ankle pain. (Tr. 828-829, 1203.)

There is also objective medical evidence in the record regarding her muscoloskeletal impairments. X-rays of her feet from December 2009 showed "significant arthritic spurring and arthritic changes in the midfoot and rearfoot area." (Tr. 1270.) Knee x-rays from March 2011 revealed moderate to severe osteoarthritis, including findings of sclerosis, extensive hypertrophic

osteophytosis, and narrowing of the patellofemoral compartments.  (Tr. 1043.)  An MRI of her right shoulder from April 2014 showed moderate tendinosis with a high grade partial bursal tear of the mid supraspinatus tendon measuring 5 mm in dimension.  (Tr. 435.)  X-rays of Coburn's lumbar spine from March 2015 showed spondylosis, hypertrophic changes, and mild degenerative disc disease; while an MRI of her left ankle the following month showed severe osteoarthritis of her tarsometatarsal joints and a longitudinal peroneal brevis split tear of the tendon measuring 3 cm.  (Tr. 430, 434.)

The ALJ decision does not address any of the above medical evidence at step three, thus providing the Court with no explanation as to why the ALJ implicitly concluded the evidence was insufficient to demonstrate involvement of Coburn's musculoskeletal body system to at least a moderate level of severity for purposes of Listing 14.06A.  As with Coburn's neurologic body system, the ALJ fails to discuss the medical evidence noted above in the context of Listing 14.06A or otherwise analyze why such evidence is insufficient to show involvement to "at least a moderate level of severity."

Finally, Coburn asserts her undifferentiated connective tissue disorder also involves her mental "body system" to "at least a moderate level of severity," as well.  The record reflects Coburn described symptoms of depression as early as February 2012.  (Tr. 917-918.)  She was diagnosed with depression in 2014 and 2015, and prescribed Cymbalta.  (Tr. 412, 406, 400, 394, 388, 381, 375.)  In February 2016, Coburn underwent a psychological intake assessment with Dr. Gerstenhaber, who diagnosed major depression and assessed a GAF of 40 indicating major impairment.  (Tr. 1065-1067.)  She presented regularly to psychiatrist Dr. Eden between February and November 2016.  (Tr. 1052-1055, 1139, 1137, 1136, 1236, 1231-1235.)  Mental

status examination findings routinely revealed flat affect, sad mood, apathetic psychomotor activity, slowed speech and rate of thought, intact memory, and fair judgment and insight.  (*Id*.) Dr. Eden assessed major depressive disorder, recurrent, severe without psychotic features; and prescribed several psychiatric medications.  (Tr. 1136, 1239, 1234.)

In October 2016, Dr. Eden authored an opinion regarding Coburn's mental functional limitations, and found she had moderate limitations in a number of areas.  (Tr. 1226-1227.)  In addition, state agency psychologist Dr. Katz, found that, beginning in December 2013, Coburn was moderately limited in her abilities to (1) understand, remember, and carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) sustain an ordinary routine without special supervision; (4) work in coordination with or in proximity to others without being distracted by them; (5) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (6) interact appropriately with the general public; (7) accept instructions and respond appropriately to criticism from supervisors; (8) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (9) respond appropriately to changes in the work setting; and (10) set realistic goals or make plans independently of others.  (Tr. 118-120.)

Again, the ALJ does not address any of the above medical or opinion evidence at step three, nor does she explain why she implicitly concluded the evidence was insufficient to demonstrate involvement of Coburn's mental health body system to at least a moderate level of severity for purposes of Listing 14.06A.

Lastly, Listing 14.06A requires evidence of "at least two of the constitutional symptoms

or signs (severe fatigue, fever, malaise, or involuntary weight loss)." 20 CFR Part 404, Subpart P, Appendix 1, Listing 14.06A.  Listing 14.00C2 defines "severe fatigue" as "a frequent sense of exhaustion that results in significantly reduced physical activity or mental function."  20 CFR Part 404, Subpart P, Appendix 1, Listing 14.00C2.  The regulations define the term "malaise" as "frequent feelings of illness, bodily discomfort, or lack of well-being that result in significantly reduced physical activity or mental function." *Id*.

Here, the Court finds there is a substantial question as to whether Coburn demonstrated that she exhibited at least two of the constitutional symptoms and signs required by Listing 14.06A.  With regard to her fatigue, treatment records reflect Coburn consistently complained of severe, chronic fatigue from early 2010 through 2016.  *See, e.g.*, Tr. 936, 932, 934, 928, 918, 914, 910, 420-425, 414-416, 408-412, 402-406, 396-398, 390-392, 383-389, 377-379, 370-375, 831-837, 774, 824-826, 1094-1096, 1087-1093, 1082-1083, 1203-1205, 1170-1174, 1293-1297.)  She was formally diagnosed with Chronic Debilitating Fatigue in March 2014 (prior to her DLI), and continued to have this diagnosis through 2016.  (Tr. 412, 406, 394, 388, 382, 375, 368, 836, 829, 821, 1097, 1092, 1085, 1208, 1200, 1195, 1186, 1178 ).  Dr. Foley repeatedly described her fatigue as "profound," despite treatment.  (Tr. 1092, 1085, 1209, 1200, 1195.)

In addition, read as a whole, Coburn's treatment records also raise a substantial question as to whether she suffered from malaise, as that term is defined in 20 CFR Part 404, Subpart P, Appendix 1, Listing 14.00C2.  Records reflect Coburn repeatedly reported weakness, joint pain and tenderness, morning stiffness, muscle cramps, dizziness, depression, anxiety, crying spells, and poor concentration and memory.  *See e.g.*, Tr. 936, 933-934, 931-932, 918, 913-914, 909-910, 907-908, 423, 417-418, 411-412, 402-406, 396-400, 377-379, 370-375, 831-

44

837, 774, 825-829, 1087-1093, 1197-1201, 1189-1196.) Moreover, physical examinations routinely revealed widespread tenderness and multiple tender points, resulting in a diagnosis of fibromyalgia beginning in July 2012. (Tr. 913-914, 907-908, 423-424, 417-418, 411-412, 405-406, 399-400, 394, 387-388, 381, 375, 367-368, 835-836, 828-829, 820-821, 1096-1097, 1091-1092, 1207-1208, 1199-1200, 1194-1195.) Dr. Foley and Ms. Zula described Coburn's fibromyalgia symptoms as "debilitating" despite treatment. (Tr. 836, 829, 821, 1097, 1092, 1208, 1200, 1195.)

The ALJ does not address the above medical evidence at step three, again providing the Court with no explanation for her implicit conclusion there was no evidence of "at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss)" necessary to meet Listing 14.06A. As with Coburn's neurologic, musculoskeletal and mental body systems, the ALJ fails to discuss the medical evidence regarding Coburn's fatigue and malaise in the context of Listing 14.06A or otherwise analyze why such evidence is insufficient to meet the requirements of this Listing.

Respondent argues remand is not required because Coburn is relying on her subjective allegations, rather than objective medical findings, to demonstrate she met Listing 14.06A. (Doc. No. 19 at 7.) The Court finds this argument to be without merit. As discussed at length above, the record contains extensive objective medical evidence (including imaging, biopsy results, and physical examination findings) that potentially support Coburn's argument that she meets the requirements of Listing 14.06A. This evidence includes the following:

- Bilateral foot x-rays from December 2009 showing "significant arthritic spurring and arthritic changes in the midfoot and rearfoot area" (Tr. 1270);

45

- Knee x-rays from March 2011 revealing moderate to severe osteoarthritis, including findings of sclerosis, extensive hypertrophic osteophytosis, and narrowing of the patellofemoral compartments (Tr. 1043);

- An MRI of Coburn's right shoulder from April 2014 showing moderate tendinosis with a high grade partial bursal tear of the mid supraspinatus tendon measuring 5 mm in dimension (Tr. 435);

- X-rays of Coburn's lumbar spine from March 2015 showing spondylosis, hypertrophic changes, and mild degenerative disc disease (Tr. 434);

- A left ankle MRI from April 2015 showing severe osteoarthritis of Coburn's tarsometatarsal joints and a longitudinal peroneal brevis split tear of the tendon measuring 3 cm  (Tr. 430);

- A November 2015 biopsy of Coburn's thigh confirming "significantly reduced epidermal nerve fiber density, consistent with small fiber neuropathy"  (Tr. 1071.)

- Physical examination findings of reduced range of motion in Coburn's knees, ankles, shoulder, and spine; widespread tenderness; swelling; multiple tender points; antalgic gait; and knee crepitus. (Tr. 935, 929, 931-932, 933-934, 931-932, 927, 923-924, 917-918, 913-914, 909-910, 907-908, 400, 423, 417-418, 411-412, 405-406, 399-400, 393-394, 387, 374, 367, 649, 647, 834-835, 828-829, 820, 1096, 1091-1092, 1207-1208, 1199, 1193-1194, 1184-1185, 1172-1173, 1295-1296, 1290.)

- Mental status examination findings of flat affect, sad mood, apathetic psychomotor activity, slowed speech and rate of thought, intact memory, and fair judgment and insight.  (Tr. 1066, 1054-1055, 1139, 1137, 1136, 1237-1238, 1232-1233.)

- A February 2016 GAF score of 40, indicating major mental impairment. (Tr. 1067.)

- Diagnoses of major depressive disorder, recurrent, severe without psychotic features.  (Tr. 1136, 1239, 1234.)

In addition, with respect to Coburn's fatigue, the Court notes Coburn was formally diagnosed with Chronic Debilitating Fatigue in March 2014 (prior to her DLI), and continued to have this diagnosis through 2016.  (Tr. 412, 406, 394, 388, 382, 375, 368, 836, 829, 821, 1097, 1092,

1085, 1208, 1200, 1195, 1186, 1178 ).

Accordingly, and in light of the above, the Court finds there is a substantial question as to whether Coburn meets the requirements of Listing 14.06A.  The Court further finds the ALJ's evaluation of this Listing is deficient because the ALJ failed, at any point in the decision, to 'actually evaluate the evidence,' compare it to the specific requirements of Listing 14.06A, and provide an 'explained conclusion" as to why the evidence failed to satisfy those requirements. *See Harvey*, 2017 WL 4216585 at * 5; *Reynolds*, 424 Fed. Appx. at 416.  Because the ALJ's failure to do so precludes meaningful review, it is recommended this matter be remanded to allow the ALJ to conduct a more thorough step three evaluation of Listing 14.06A.

### Opinion of State Agency Physician Dr. Katz

Coburn next argues the ALJ failed to properly consider the opinion of state agency psychologist Dr. Katz that she could function "in a setting where others can provide redirection/reassurance when needed."  (Doc. No. 16 at 20-21.)  Coburn notes that, although the ALJ purports to give Dr. Katz's opinion "great weight," the decision fails to acknowledge this particular opinion and, further, fails to explain why a limitation relating to redirection and/or reassurance was not included in the RFC.  (*Id*.)  Coburn argues the ALJ's failure to do so is not harmless error in light of VE testimony that the need for redirection/reassurance could be work preclusive under certain circumstances.  (*Id.*)

The Commissioner argues Coburn's argument lacks merit because "the ALJ was under no obligation to wholesale adopt any doctor's opinion when formulating the RFC."  (Doc. No. 19 at 4.)  She further maintains "there is no legal basis for arguing that affording Dr. Katz's opinion great weight meant that the ALJ had to accept all limitations opined by the doctor."  (*Id.*

at 4.)

In formulating the RFC, ALJs "are not required to adopt any prior administrative medical findings [made by federal or state agency consultants], but they must consider this evidence . . . because our Federal or State agency medical and psychological consultants are highly qualified and experts in Social Security disability evaluation."  20 CFR § 404.1513a (b)(1).  When doing so, an ALJ will consider several factors "in deciding the weight we give to any medical opinion," including, the nature and duration of the relationship, the supportability and consistency of the opinion, specialization, and other factors such as "the amount of understanding of our disability programs and their evidentiary requirements that a medical source has, regardless of the source of that understanding, and the extent to which a medical source is familiar with the other information in your case record."  20 C.F.R. § 404.1527(c). Finally, an ALJ "generally should explain the weight given to opinions from these sources or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." 20 CFR § 404.1527(f)(2).

Here, state agency psychologist Bonnie Katz, Ph.D., reviewed Coburn's medical records and completed a Mental RFC Assessment on October 8, 2015.  (Tr. 114, 118-120.) Therein, Dr. Katz found Coburn was moderately limited in her abilities to[15] (1) understand, remember, and carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) sustain an ordinary routine without special supervision; (4) work in

---

[15] Dr. Katz stated that her opinions related to the time period from December 16, 2013 to the date of her opinion.

coordination with or in proximity to others without being distracted by them; (5) complete a

normal workday and workweek without interruptions from psychologically based symptoms and

to perform at a consistent pace without an unreasonable number and length of rest periods; (6)

interact appropriately with the general public; (7) accept instructions and respond appropriately

to criticism from supervisors; (8) get along with coworkers or peers without distracting them or

exhibiting behavioral extremes; (9) respond appropriately to changes in the work setting; and

(10) set realistic goals or make plans independently of others.  (Tr. 118-120.)

Dr. Katz further explained that Coburn was "able to perform simple tasks not requiring

her to sustain close consistent attention/concentration over an extended period, nor to meet fast-

paced performance demands, **in a setting where others can provide redirection/reassurance**

**when needed**."  (Tr. 119) (emphasis added).  She also found Coburn was able to interact with

others in a work setting on a limited, brief, and superficial basis, and was able to adapt to

infrequent changes in routine that are introduced and explained fully, in advance.  (Tr. 119-120.)

The ALJ accorded Dr. Katz's opinion "great weight," explaining as follows:

> At the reconsideration level, State agency mental health consultant Bonnie  Katz,
> Ph.D., opined that the claimant is able to understand and remember simple task
> instructions, is able to perform simple tasks, is able to interact with others in a work
> setting on a limited, brief, and superficial basis, and is able to adapt to infrequent
> changes in routine (Exhibit 3A).  Dr. Katz noted the claimant's treatment for
> depression symptoms, and that the claimant is able to perform activities of daily
> living.  These opinions are given great weight because it is generally consistent with
> the medical evidence of record.  The record does not include extensive mental health
> treatment records during the relevant period, and examinations  have found that
> despite some depression, the claimant had mostly normal cognitive functioning.

(Tr. 24.)  As Coburn correctly notes, the ALJ does not explicitly address Dr. Katz's specific

opinion that Coburn would need to work "in a setting where others can provide

redirection/reassurance when needed."  (Tr. 119.)  It does not appear this specific limitation was

included in the RFC, which found Coburn was capable of "performing simple, routine tasks, can have occasional interaction with supervisors, co-workers, and the public, and is limited to occasional routine workplace changes."  (Tr. 21.)

As it is recommended this matter be remanded for further consideration of whether Coburn meets the requirements of Listing 14.06A, the Court need not address whether the ALJ erred in failing to expressly address Dr. Katz's opinion regarding the need for redirection/reassurance.  However, on remand, the ALJ should consider giving additional consideration to this specific opinion, in light of the VE's testimony that, under certain circumstances, such a limitation could be work preclusive.  (Tr. 90-91.)

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be VACATED and the case REMANDED for further consideration.

_s/Jonathan D. Greenberg_
Jonathan D. Greenberg
United States Magistrate Judge

Date: March 5, 2019

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**